IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KINTE M. GRAVES,

             Petitioner,                No. 2:05-cv-1349 GEB KJN P

    vs.

RICHARD J. KIRKLAND, et al.,

           Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

I. <u>Introduction</u>

         Petitioner is a state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2003 conviction for assault with a firearm (Cal. Penal Code § 245(a)(2)), making a criminal threat (Cal. Penal Code § 422), possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)), corporal injury to a spouse resulting in a traumatic condition (Cal. Penal Code § 275.5(a)), battery (Cal. Penal Code § 242) and assault (Cal. Penal Code § 240).  Petitioner was also found to have personally used a firearm in the commission of the crimes of assault with a firearm and making a criminal threat (Cal. Penal Code §§ 1203.066(a)(1), 12022.5(a)(1)).  Petitioner is serving a sentence of 15 years to life.

////

1        This action is proceeding on the petition originally filed in the United States

2    District Court for the Northern District of California on June 27, 2005.  (Dkt. No. 1.)   Petitioner

3    raises the following claims: 1) violation of <u>Blakely v. Washington</u>, 542 U.S. 296 (2004); 2) the

4    trial court violated petitioner's right to due process by granting the prosecution's motion to

5    consolidate the charges; 3) the prosecutor improperly commented on petitioner's exercise of his

6    right to remain silent; 4) ineffective assistance of counsel; and 5) violation of <u>Batson v.</u>

7    <u>Kentucky</u>, 476 U.S. 79 (1986).

8        After carefully considering the record, the undersigned recommends that the

9    petition be denied.

10   II.  <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

11       In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court defined

12   the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

13   Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

14   court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

15   Supreme Court, and an "unreasonable application of" that law.  <u>Id</u>. at 405.  "Contrary to" clearly

16   established law applies to two situations:  (1) where the state court legal conclusion is opposite

17   that of the Supreme Court on a point of law; or (2) if the state court case is materially

18   indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

19   opposite.

20       "Unreasonable application" of established law, on the other hand, applies to

21   mixed questions of law and fact, that is the application of law to fact where there are no factually

22   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

23   <u>Id</u>. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

24   to state court decisions.  While the deference is not blindly automatic, "the most important point

25   is that an *unreasonable* application of federal law is different from an incorrect application of

26   law....[A] federal habeas court may not issue the writ simply because that court concludes in its

1   independent judgment that the relevant state-court decision applied clearly established federal

2   law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

3   11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

4   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

5   authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

6   "Clearly established" law is law that has been "squarely addressed" by the United

7   States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

8   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

9   Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

10  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

11  unnecessary showing of uniformed guards does not qualify as clearly established law when

12  spectators' conduct is the alleged cause of bias injection).

13  The state courts need not have cited to federal authority, or even have indicated

14  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

15  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

16  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

17  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

18  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

19  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

20  as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

21  Packer, 537 U.S. at 9.

22  However, where the state courts have not addressed the constitutional issue in

23  dispute in any reasoned opinion, the federal court will independently review the record in

24  adjudication of that issue.  "Independent review of the record is not de novo review of the

25  constitutional issue, but rather, the only method by which we can determine whether a silent state

26  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

III.  Factual and Procedural Background

The opinion of the California Court of Appeal contains a summary of the factual and procedural background.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> In May 2002, defendant held a gun to the head of his estranged wife, Mischell Hamilton, and told her "you'll never see your kids again."
>
> In September 2002, defendant struck his girlfriend (and the mother of his child), Lashaunda Henderson, in the face with what she believed to be a firearm.
>
> The district attorney filed two complaints against defendant, one arising from the assault on Hamilton (case No. 02F08053) and the other arising from the assault on Henderson (case No. 02F07947).  Ultimately, the trial court granted the prosecutor's motion to consolidate the two cases.  The jury found defendant guilty of assaulting Hamilton with a firearm, making a criminal threat against her, and being a felon in possession of a firearm.  The jury also found two gun use enhancement allegations true.  With respect to Henderson, the jury found defendant guilty of inflicting corporal injury on her and assaulting and battering her; however, the jury acquitted him of battery with serious bodily injury and assault with a deadly weapon.  Defendant received an aggregate prison term of 15 years, which consisted of the upper term of four years on count one (assault with a firearm on Hamilton), the upper term of 10 years on the gun enhancement on count one, and one year (one third of the middle term) on count four (inflicting corporal injury on Henderson).

Respondent's Exhibit A, pp. 2-3.

Discussion of petitioner's claims requires a more detailed summary of the testimony and evidence:

*Evidence re: Henderson Charges*

Lashaunda Henderson testified that petitioner is the father of her son.  (Reporter's Transcript ("RT") at 44.)  In September 2002, she worked at the Mercy Med Clinic on the graveyard shift.  (RT at 46, 49.)  On September 3, 2002, when she arrived at work, she called her

4

1   mother and told her that petitioner had beaten her up.  (RT at 56-57.)  At trial, she testified that

2   she lied when she told her mother that petitioner had inflicted her injuries.  (RT at 57.)  Later, the

3   police arrived to talk to her.  (RT at 60.)  She told the first officer with whom she spoke that her

4   injuries were caused by someone who jumped her.  (RT at 61.)  Henderson was later taken to the

5   hospital where she spent the night.  (RT at 62-63.)

6           Several days after September 3, 2002, Henderson spoke with Detective Rankin.

7   (RT at 66.)  Henderson told Detective Rankin that she did not want to press charges because she

8   did not know who hurt her.  (Id.)  Henderson told Detective Rankin that she had been jumped by

9   some girls.  (RT at 67.)  At trial, Henderson said this was not true. (RT at 67.)

10          At trial, Henderson testified that her injuries were caused during a fight with

11   Grace Jennings.  (RT at 71.)  Jennings, although not a blood relative, was like a sister to

12   petitioner.  (RT at 82.)  Henderson also testified that she brought her son to see petitioner at the

13   jail during the course of the criminal proceedings against him approximately 20-30 times.  (RT at

14   71-73.)  She testified that at the time of the incident, she was mad at petitioner because he was

15   having a baby with another woman, suggesting that was why she falsely blamed petitioner for

16   beating her.  (RT at 76-77.)

17          Officer Barretto testified that he interviewed Henderson on the night of the

18   incident at the emergency room.  When Officer Barretto asked Henderson what happened she

19   answered that she got beat up but did not want to press charges.  (RT at 102.)  Henderson told

20   Officer Barretto that petitioner had hurt her.  (Id.)  She told Officer Barretto that he hurt her the

21   evening before at about 6 p.m. at San Jose and 8th Avenue.  (RT at 103.)  She and petitioner

22   were walking when he struck her in the face with what she believed was a firearm.  (Id.)  She told

23   Officer Barretto that petitioner hit her because he found out that she was messing around with a

24   man named C.K.  (RT at 105.)

25          Police Officer Rankin testified that Henderson told her that she never told the

26   police that petitioner assaulted her and that the police who said she did were lying.  (RT at 113.)

1    Officer Rankin testified that Henderson told her that she was assaulted by two or three girls.  (Id.)

2    　　　　　Hulan Washington testified that he worked with Henderson at the hospital on the

3    night of the incident.  He overheard her talking to people on the phone about her injuries.  (RT at

4    167.)  He remember her saying, "he did this or he did that," but nothing more specific.  (RT at

5    168.)  He did not hear her saying anything to the effect that a woman caused her injuries.  (Id.)

6    　　　　　　　　　*Evidence re: Hamilton Charges*

7    　　　　　Newvonna Carter testified that she is Hamilton's cousin.  (RT at 127.)  Carter

8    testified that on May 11, 2002, she was visiting her sister-in-law, Vandell Goins.  (RT at 128.)

9    Carter, Hamilton, Goins and Goins' five children and Carter's children were there.  (RT at 128-

10   29.)  Around 7 or 8 p.m. petitioner arrived at the door and asked for Carter's brother.  (RT at

11   131.)  After being told that Carter's brother was not there, petitioner walked in the house.  (RT at

12   132.)  At this point, Carter went out the front door.  (Id.)  She saw petitioner talking to Hamilton.

13   (Id.)  She then saw that petitioner had Hamilton by the ponytail and Hamilton was screaming.

14   (RT at 133.)  Carter saw that petitioner had a gun in his hand and heard him say something like,

15   "I'll kill you, you'll never see your daughter."  (RT at 134.)  At this time, Carter was at the front

16   door.  (Id.)  Carter yelled for petitioner to leave Hamilton alone.  (RT at 135.)  Vandell Goins

17   then called the police.  (RT at 136.)  While Carter was outside, she also saw petitioner hit

18   Hamilton in the forehead.  (RT at 140.)

19   　　　　　Hamilton testified that on May 11, 2002, she was living with Vandell Goins.  (RT

20   at 172.)  She saw petitioner once or twice a month.  (RT at 173.)  She had a daughter with him.

21   (Id.)  On May 11, 2002, she was at Goins' house braiding hair.  (Id.)  At some time, petitioner

22   arrived.  (RT at 175.)  Petitioner and Carter began arguing outside the house.  (Id.)  Hamilton

23   went outside and told petitioner to stop arguing and to leave.  (RT at 176.)  Petitioner and

24   Hamilton then started arguing.  (Id.)  Petitioner began pulling Hamilton's hair.  (Id.)  Hamilton

25   then punched petitioner in the eye.  (Id.)  This fight occurred inside the house.  (Id.)  Petitioner

26   got upset after Hamilton hit him.  (RT at 176.)  Petitioner then charged Hamilton.  (RT at 177.)

1    As they struggled, petitioner pulled out a gun.  (Id.)  Hamilton got under a table.  (Id.)  Petitioner

2    put the gun to her head and said, "bitch, you will never see your kids."  (RT at 178.)  One of

3    petitioner's friends then came in the house and began arguing with Carter.  (RT at 179.)

4    Petitioner and his friend then left the house.  (Id.)

5           Hamilton called 911.  The tape from this call, which was not transcribed in the

6    court record, was played for the jury.  (RT at 180.)

7    IV.  Discussion

8           A.  Claim One

9           Petitioner alleges that his upper term sentences for count one and its related gun

10   enhancement, as well as his consecutive sentence for count four, violate the Supreme Court's

11   holding in Blakely v. Washington, 542 U.S. 296 (2004).  The California Court of Appeal was the

12   last state court to issue a reasoned decision addressing this claim.

13          The undersigned first considers the claim that imposition of the upper term

14   sentences for count one and the related gun enhancement violated Blakely.  After petitioner's

15   conviction became final, the Supreme Court decided Cunningham v. California, 549 U.S. 270

16   (2007), which extended the holding of Blakely.  For the following reasons, the undersigned finds

17   that Cunningham is applicable to petitioner's claims.

18          In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme

19   Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any

20   fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

21   submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.   In Blakely, the

22   Supreme Court held that the "statutory maximum for Apprendi purposes is the maximum

23   sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or

24   admitted by the defendant."  Blakely, 542 U.S. at 303.

25          In People v. Black, 35 Cal.4th 1238 (2005) ("Black I"), the California Supreme

26   Court held that California's statutory scheme providing for the imposition of an upper term

sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  The court reasoned that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term rendered the upper term under California law the "statutory maximum." Black I, 35 Cal.4th at 1257-61.

In Cunningham, the United States Supreme Court held that a California judge's imposition of an upper term sentence based on facts found by the judge (other than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and Blakely. Cunningham expressly disapproved the holding and the reasoning of Black I, finding that the middle term in California's determinate sentencing law was the relevant statutory maximum for purposes of applying Blakely and Apprendi.  Cunningham, 549 U.S. at 291-94.

In Butler v. Curry, 528 F.3d 624 (9th Cir. 2008), the Ninth Circuit held that Cunningham applied retroactively to a petitioner whose conviction became final on direct review in 2005, after the Blakely decision.  In so concluding, the Ninth Circuit examined the "legal landscape" at the time of Butler's sentence and concluded that: "Taken together, Apprendi, Blakely, and Booker firmly established that a sentencing scheme in which the maximum possible sentence is set based on facts found by a judge is not consistent with the Sixth Amendment." Id. at 635.

In the instant case, petitioner's conviction became final ninety days after the January 27, 2005 order by the California Supreme Court denying his petition for review. (Respondent's Exhibit 5);  Beard v. Banks, 542 U.S. 404, 411-13 (2004) ("State convictions are final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or such a petition has been finally denied"); Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999) (the period of "direct review" in 28 U.S.C. § 2244(d)(1)(A) includes the period within which a petitioner can file a petition for a writ of certiorari with the United States Supreme Court). Accordingly, Cunningham is applicable because petitioner's conviction became final after

1   <u>Blakley</u> was decided.

2         In light of <u>Cunningham</u>, the Supreme Court vacated <u>Black I</u> and remanded the

3   case to the California Supreme Court for further consideration.  <u>Black v. California</u>, 549 U.S.

4   1190 (2007).  On remand, the California Supreme Court held that "so long as a defendant is

5   eligible for the upper term by virtue of facts that have been established consistently with Sixth

6   Amendment principles, the federal Constitution permits the trial court to rely upon any number

7   of aggravating circumstances in exercising its discretion to select the appropriate term by

8   balancing aggravating and mitigating circumstances, regardless of whether the facts underlying

9   those circumstances have been found to be true by a jury."  <u>People v. Black</u>, 41 Cal.4th 799, 813

10  (2007) (<u>Black II</u>).  In other words, as long as one aggravating circumstance has been established

11  in a constitutional manner, a defendant's upper term sentence withstands Sixth Amendment

12  challenge.  Relying on <u>Black II</u>, the Ninth Circuit recently confirmed that under California law

13  only one aggravating factor is necessary to authorize an upper term sentence.  <u>Butler v. Curry</u>,

14  528 F.3d 624, 641-43 (9th Cir. 2008).

15        Turning to the merits of petitioner's claim, petitioner was sentenced to the upper

16  term of four years for count one and the upper term of ten years for the related gun enhancement.

17  (RT at 361.)  The court sentenced petitioner to the upper terms based on his prior convictions as

18  a juvenile and as an adult and because it believed that petitioner was dangerous.  (RT at 361–62.)

19  Regarding his prior convictions, the probation report stated that petitioner had prior juvenile

20  felony convictions for robbery, vehicle theft and assault with a deadly weapon, and one adult

21  felony conviction for vehicle theft.  (Clerk's Transcript ("CT") at 314-15).  Accordingly, the trial

22  court imposed the upper terms in part based on the petitioner's numerous prior convictions.

23  Reliance on prior convictions as a sentencing enhancing factor does not run afoul of <u>Apprendi</u>, in

24  that such prior convictions need not be proven to a jury.  <u>Apprendi</u>, 530 U.S. 490.

25        Because petitioner's upper term sentences were based, in part, on the fact of

26  petitioner's prior convictions, the trial court did not violate petitioner's Sixth Amendment rights

9

by imposing the upper term sentences for count one and the related gun enhancement.  Apprendi,

Blakely, Cunningham, supra.[1]

Petitioner next argues that imposition of consecutive sentences for counts one and

four violated the Sixth Amendment.  In Oregon v. Ice, ---U.S. ---, 129 S.Ct. 711, 714-15 (2009),

the Supreme Court held that a defendant is not entitled to a jury determination of the facts

necessary to the imposition of consecutive sentences.  Accordingly, this claim is without merit.

The denial of these claims by the California Court of Appeal was not an

unreasonable application of clearly established Supreme Court authority.  Accordingly, these

claims should be denied.

B.  Claim Two

Petitioner argues that the trial court improperly consolidated the trial of the two

cases against him.  The California Court of Appeal denied this claim for the following reasons.[2]

Background

On the first day of trial, the prosecutor presented a proposed amended information
consolidating the charges in both cases. That afternoon, defendant filed a written
opposition to consolidation. Defendant contended he would be prejudiced by
consolidation because the case involving Hamilton included a charge that he was
a felon in possession of a firearm, while the case involving Henderson did not.
He also argued that evidence of a prior domestic violence incident would be

---

[1]  Although not directly raised by petitioner, he may be arguing that the use of his juvenile
convictions to impose the upper terms violated the Sixth Amendment.  In United States v. Tighe,
266 F.3d 1187, 1194 (9th Cir. 2001), the Ninth Circuit held that the Apprendi "prior conviction"
exception encompasses only those proceedings that provide a defendant with the procedural
safeguards of a jury trial and of proof beyond a reasonable doubt.  As a result, the Tighe court
declined "to extend Apprendi's 'prior conviction' exception to include prior nonjury juvenile
adjudications."  Id.

Since deciding Tighe, the Ninth Circuit has recognized that both California courts
and other federal circuit courts of appeal disagree with its holding in Tighe, supra.  See Boyd v.
Newland, 467 F.3d 1139, 1152 (9th Cir. 2006).  Thus, while Tighe remains good law in the
Ninth Circuit, "the opinion does not represent clearly established federal law 'as determined by
the Supreme Court of the United States.'"  Boyd, 467 F.3d at 1152 (quoting 28 U.S.C. §
2254(d)(1)).  Accordingly, a claim by petitioner that use of his juvenile convictions to impose the
upper term violated the Sixth Amendment would be denied.

[2]  For ease of reading, internal parallel citations have been deleted.

admissible in one case but not the other.  Finally, defendant argued the evidence in one case was weak, and that case would be "unfairly bolstered by joinder with a strong case."

The following day, the prosecutor argued consolidation was proper because the evidence in both cases would be cross-admissible under Evidence Code section 1109 (FN2).  Defense counsel responded that notwithstanding section 1109, the evidence in the two cases was not cross-admissible because "1109 is still subject to 352."  The trial court granted the motion to consolidate the two cases, saying: "The Court finds that there is a cross admissibility issue here that I believe that both acts would be admissible one against the other should the cases be tried separately.  It is of the same class and it involves the same defendant, similar kind of crime.  The Court does not believe that consolidation would unduly deprive the defendant of a fair trial or unduly prejudice him, so I'm going to grant the motion to consolidate."

> FN2. Evidence Code section 1109 allows admission of evidence of a defendant's other acts of domestic violence in a prosecution for an offense involving domestic violence.  All further statutory references are to the Evidence Code unless otherwise indicated.

Defendant contends "[t]he trial court erred by granting the prosecution ['s] motion to consolidate the informations because a joint trial deprived appellant of a fair trial."  We find no error.

Analysis

"An accusatory pleading may charge ... two or more different offenses of the same class of crimes or offenses, under separate counts...." (Pen.Code, § 954.) However, "the court in which a case is triable, in the interests of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  (Ibid.)

Where (as here) the charges in the case all allege offenses of the same class (defendant conceded as much in the trial court), the statutory requirements for joinder are satisfied, and the defendant can predicate error "only on a clear showing of potential prejudice ."  (People v. Kraft (2000) 23 Cal.4th 978, 1030.) We review the trial court's ruling for abuse of discretion, which we will find only if the ruling falls outside the bounds of reason.  (Ibid.; People v. Osband (1996) 13 Cal.4th 622, 666.)

"'The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges

11

carries the death penalty or joinder of them turns the matter into a capital case." (<u>People v. Sandoval</u> (1992) 4 Cal.4th 155, 172-73.)

Defendant first argues consolidation was improper because the evidence in the two cases was not cross-admissible.  He contends "[t]he trial court erred by relying on section 1109 as the basis for cross-admissibility of the incidents because section 1109 is unconstitutional" because it "violates due process and equal protection."  Defendant did not raise this argument in the trial court, and he may not raise it for the first time on appeal.  (<u>See</u> <u>People v. Catlin</u> (2001) 26 Cal.4th 81, 122.)  In any event, defendant's argument lacks merit because, as he himself acknowledges, many appellate decisions "have squarely upheld the constitutionality of section 1109."  (<u>See</u>, <u>e.g.</u>, <u>People v. Jennings</u> (2000) 81 Cal.App.4th 1301, 1310-13.)  Accordingly, defendant's constitutional argument warrants no further discussion.

Defendant next contends that even if section 1109 is constitutional, the evidence in the two cases was not cross-admissible because "the incident with Ms. Henderson was not admissible to prove the incident with Ms. Hamilton" under section 352.  Section 352 permits the court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will ... create substantial danger of undue prejudice."  Defendant, however, fails to present a developed argument under section 352, arguing only that the incidents were "separate and independent" and that the evidence of the Henderson incident was "weak and conflicting."  This argument is not sufficient to persuade us the trial court abused its discretion in determining the evidence of the two incidents was cross-admissible. In any event, "[c]ross-admissibility of evidence in separate trials is but one of the factors the trial court must consider in determining whether potential prejudice requires severance."  (<u>People v. Price</u> (1991) 1 Cal.4th 324, 389.)

Moving on to other criteria used in determining whether consolidation is proper, defendant contends he made "a clear showing of potential prejudice"  (<u>People v. Kraft</u>, 23 Cal.4th at p. 1030) from the consolidation of the two cases because "[t]he evidence pertaining to the incident with Ms. Henderson was weak and conflicting," while "[t]he prosecution['s] evidence against appellant concerning the incident with Ms. Hamilton was stronger."  Defendant contends the case against him involving Henderson was weak because it "rested on Ms. Henderson's out-of-court and largely uncorroborated statements."  (FN3).  Defendant also claims he was prejudiced because evidence of his felon status was admissible only in the case involving Hamilton.

> FN3.  Before trial, Henderson told various people that defendant had assaulted her.  At trial, she claimed defendant's sister was the culprit.

In opposing the prosecutor's motion to consolidate the two cases, the only information defendant put before the court regarding the comparative strength of the two cases was this: "It is certainly the position of the defense that the case alleging domestic violence [i.e., the Henderson case] is considerably 'weaker' for the prosecution than the other case.  The non-alleged domestic violence case has a recorded 911 call from the victim and percipient witnesses.  The domestic

violence case only has statements made by the alleged victim to civilian witnesses who may or may not appear in court because of their continuing failure to comply with a court order." (FN4).  Based on this meager showing, the trial court did not abuse its discretion in implicitly concluding defendant had not made a clear showing of potential prejudice from consolidation.

> FN4.  Defendant's distinction between the "case alleging domestic violence" and the "non-alleged domestic violence case" appears to have derived from the fact that the Henderson case included an alleged violation of Penal Code section 273.5, subdivision (a) (corporal injury to the parent of the defendant's child), while the Hamilton case did not include a similar "domestic violence" charge.

Defendant repeatedly relies on the testimony produced at trial to support his argument that consolidation was error.  That reliance is misplaced.  "[I]n assessing whether the trial court abused its discretion in denying severance, we examine the state of the record at the time of the ruling."  (People v. Kraft, 23 Cal.4th at 1032.)  Thus, the question is not whether there was an abuse of discretion in hindsight based on the evidence produced at trial, but whether there was an abuse of discretion "in light of the showings made and facts known at the time the motion for severance [wa]s made."  (People v. Gomez (1994) 24 Cal.App.4th 22, 27.)  Defendant has shown no abuse of discretion under that standard.

As for defendant's assertion that consolidation was improper because evidence of his felon status would have been admissible only in the Hamilton case, we are not persuaded "the presence of the ex-felon in possession of a gun charge [wa]s 'unusually likely to inflame the jury against the defendant.'"  (People v. Gomez, 24 Cal.App.4th at 29, quoting People v. Sandoval (1992) 4 Cal.4th 155, 172.)  It is significant to note that the jury actually acquitted defendant of the greater charges of battery with serious bodily injury and assault with a deadly weapon in the Henderson incident and convicted him of only the lesser charges of assault and battery.  Thus, we conclude defendant has not shown an abuse of discretion in the consolidation of the two cases against him (FN5).

> FN5.  To the extent defendant contends (in passing) that consolidation of the cases violated his right to due process under the United States Constitution, we reject that contention also.  Having looked to the evidence actually introduced at trial, "we find neither actual nor potential prejudice such as to render the trial grossly unfair and thus deny due process."  (People v. Bean (1988) 46 Cal.3d 919, 940.)

(Respondent's Exhibit A, pp. 3-9.)

"Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  United States v. Lane, 474 U.S. 438, 446 n. 8 (1986).  "In evaluating prejudice, the Ninth Circuit focuses particularly on

13

cross-admissibility of evidence and the danger of 'spillover' from one charge to another, especially where one charge or set of charges is weaker than another." Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

As set forth above, the undersigned has reviewed the transcript from the trial and does not find that the evidence supporting the Henderson charges was so weak that joining that case with the Hamilton charges violated petitioner's right to due process. As discussed above, shortly after the incident, Henderson told her mother and Officer Barreto that petitioner had beaten her. Her co-worker, Hulan Washington, overheard her on the phone stating that "he" hurt her, as opposed to "she." Henderson later told two different other stories regarding how her injuries occurred, i.e. that she was jumped by a group of girls and beaten by Jennings. These stories appear to have been a fairly obvious attempt to protect petitioner from prosecution.

Because the evidence that petitioner assaulted Henderson was not weak, consolidating the Henderson charges with the Hamilton charges did not prejudice petitioner. Moreover, for the reasons stated by the California Court of Appeal, petitioner has not convincingly demonstrated that evidence from the charges was not cross-admissible. For these reasons, the undersigned finds that the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.[3]

C.  Claim Three

Petitioner alleges that the prosecutor violated his Fifth Amendment right against self-incrimination by commenting on his refusal to testify. The California Court of Appeal denied this claim for the following reasons.

---

[3]  In his state appeal, petitioner argued that admission of propensity evidence by way of Cal. Evid. Code § 1119 violated his right to due process. It is unclear whether petitioner is raising that claim in the instant petition. In any event, the Supreme Court has specifically reserved the question of whether the admission of propensity evidence violates due process. Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991). Accordingly, such a claim would fail as there is no clearly established Supreme Court authority holding that propensity evidence violates due process.

Defendant did not testify at trial.

During closing argument, the prosecutor began his summary of the Henderson case by attempting to explain why Henderson recanted her initial claim that defendant was the perpetrator and why she was still with him.  In pertinent part, the prosecutor argued:

"[S]o I do want to ask you basically what is the evidence in support of why she would recant?  Why would somebody [who] gets pistol whipped stay with the guy?  And this is all evidence before you.

"I don't think that you have to really stretch to get most of this information.  One of the things that is pertinently clear is that the dynamics of the relationship are the dynamics of domestic violence in part.  And these are some of the factors that may have and I believe are supported by the evidence that affect her in court.

"We have this notion that he is the father of her child.  There is clear evidence before you that she had visited him on numerous occasions.  The number 30 was my recollection.  Of course, it may not be yours and you can ask the court reporter about that, but there is clear contact with the defendant from the time of the offense until today.

"And you may ask yourself how important is that.  What does she have to do to go see him, to spend time with him?  Step back and think about the preparation and the requirements to do that.  And what's required for her to actually go down there and visit with him.  And then think about the number of times that she went down there.  And ask yourself whether or not she still has an emotional attachment to the defendant.

"And it doesn't take much to see her in court or to look at this evidence and to know that.  That is something that is well within the range of what's going on here.  And why is that?  Why [is] she still emotionally attached to him?  I would submit to you, her life was going okay.  She had a decent job at the medical clinic and she is back with him, but she's back with him in her state of mind.  We don't know where he's at.  We don't have his state of mind before you concerning that.  That's not evidence before you.  But her's [ sic ] certainly is.

"And I would submit to you that it is an age-old story, one that is well within your knowledge of life.  For her that may be the best option for an emotional relationship, for attachment, for a possibility of a romantic partner."

After the prosecutor finished his opening argument and defense counsel completed his argument, outside the presence of the jury, defense counsel moved for a mistrial "based on a Griffin error ... based on a statement made by the prosecutor during his closing argument, [which] dealt with the state of mind of my client.  And I believe that the statement was that we do not know my client's state of mind.... And I would argue that that is an oblique reference to his failure to explain to the jury what his state of mind was, and thereby a reference to him not testifying."

After the reporter read back the pertinent portion of the argument, and counsel

15

presented their positions, the trial court agreed with defense counsel that "it [wa]s an oblique reference to the fact that the defendant didn't put on any evidence as to what his state of mind was.  So in that regard it could be construed as commenting on his failure to testify.  [¶] It can also be construed, as [the prosecutor] said, that he was referring to the defendant's state of mind during the course of the events to which the evidence made reference.  [¶] I don't think it's such a serious error that the Court need[s] to declare a mistrial.  I'm going to deny your motion for a mistrial."

Defendant contends the trial court erred in denying his motion for a mistrial because the prosecutor's comment that there was no evidence of his state of mind violated his constitutional rights.  We agree the prosecutor's comment constituted Griffin (FN7) error, but conclude that error was harmless.

FN7.  Griffin v. California (1965) 380 U.S. 609.

"Prosecutorial comment which draws attention to a defendant's exercise of his constitutional right not to testify, and which implies that the jury should draw inferences against defendant because of his failure to testify, violates defendant's constitutional rights." (People v. Murtishaw (1981) 29 Cal.3d 733, 757, citing Griffin v. California, 380 U.S. 609.)  "Under the Fifth Amendment of the federal Constitution, a prosecutor is prohibited from commenting directly or indirectly on an accused's invocation of the constitutional right to silence.  Directing a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt." (People v. Lewis (2001) 25 Cal.4th 610, 670.)  "[I]t is [ Griffin ] error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide." (People v. Hughes (2002) 27 Cal.4th 287, 372.)

 Here, the prosecutor committed Griffin error when he commented that the jury did not have evidence of defendant's state of mind, because only defendant's testimony could have provided that evidence.  Such was the case here.  However, "'[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error.'" (People v. Boyette (2002) 29 Cal.4th 381, 455-56, quoting People v. Bradford (1997) 15 Cal.4th 1229, 1340.)  The prosecutor's comment was not directed at defendant's state of mind in committing the crimes with which he was charged.  Rather, the comment was directed at defendant's state of mind regarding his relationship with Henderson and was really an aside in an argument addressing Henderson's state of mind to explain why she would recant her earlier claim that defendant was the person who assaulted her.  Most importantly, there was no inference of guilt to be drawn from the prosecutor's comment.  Consequently, the error was harmless.

(Respondent's Lodged Document A, pp. 18-22.)

        "[T]he Fifth Amendment ... forbids either comment by the prosecution on the

accused's silence or instructions by the court that such silence is evidence of guilt."  Griffin v.

California, 380 U.S. 609, 615  (1965).  The Supreme Court, however, concluded that Griffin error

did not mandate automatic reversal if it was harmless.  <u>Chapman v. California</u>, 386 U.S. 18, 22 (1967); <u>see</u> <u>also</u> <u>United States v. Hasting</u>, 461 U.S. 499, 509 (1983) (holding that <u>Chapman</u> mandates harmless error analysis of <u>Griffin</u> error).  In <u>Brecht v. Abrahamson</u>, the Supreme Court held that constitutional error is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v. Abrahamson</u>, 507 U.S. 629, 622 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

For the reasons stated by the California Court of Appeal, the undersigned finds that the prosecutor's brief allusion to petitioner's failure to testify was harmless.  As noted by the state appellate court, the prosecutor's comment was not directed to petitioner's state of mind when he committed the crimes but to the present state of his relationship with Henderson.  This brief comment did not have a substantial and injurious effect on the verdict.  <u>See</u> <u>also</u> <u>Anderson v. Nelson</u>, 390 U.S. 523, 524 (1968) (<u>Griffin</u> error is harmless unless "such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal").

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

D.  <u>Claim Four</u>

Petitioner argues that counsel was ineffective for failing to subpoena defense witness Grace Jennings.  Petitioner also argues that counsel was ineffective for not discovering witness Joi Pope (also referred to as "Joy") before trial.

The test for demonstrating ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  <u>Id.</u> at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  <u>Id.</u> at 690.  The federal court must then

determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor, 529 U.S. 362, 391-93 (2000), (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

The Supreme Court has emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411.[4]  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his

---

[4]  This internal citation should be corrected to Williams v. Kaiser, 323 U.S. 471, 477 (1945).

case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002).

The California Court of Appeal denied these ineffective assistance of counsel claims for the following reasons:

> After the prosecutor rested, defense counsel informed the court that the witness he intended to present, Grace Jennings, was unavailable due to illness, but would be available the following day. Jennings, who was raised by defendant's parents and referred to defendant as her brother, had testified at the preliminary hearing that it was she, and not defendant, who assaulted Henderson. This was consistent with Henderson's trial testimony.
>
> The next morning, Jennings failed to appear, and defense counsel was unable to locate her. Counsel moved for a one-day continuance. The court asked whether counsel had subpoenaed her, and counsel responded that he had not because "[s]he had always been a willing witness ... and we had every reasonable belief that she would appear as she did at the preliminary hearing." The court refused to continue the case, concluding good cause for a continuance was lacking because the witness was not under subpoena and "[y]ou just don't know where she is." Defense counsel asked the court to deem Jennings unavailable (so that he could offer her preliminary hearing testimony into evidence), but the court refused because counsel had "not made any attempt to procure her attendance by the Court's process." (FN8).
>
>> FN8. Under subdivision (a)(5) of section 240, a person is unavailable as a witness if the person is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."
>
> In the absence of Jennings, the defense case was limited to the reading of two stipulations to the jury.
>
> After the jury returned its verdicts, defense counsel moved for a new trial. He asserted there was a new witness (Joi Pope) who had just come forward who could testify about the incident involving Hamilton. He also asserted a new trial should be granted because Jennings's failure to appear rendered defendant's trial unfair, and the failure to appear was due to the equivalent of "'involuntary intoxication.'" (FN9). Counsel explained that his failure to issue a subpoena to Jennings was "a trial tactic that had been carried forward from her appearance when she gave sworn testimony at the preliminary hearing."
>
>> FN9. In a supporting declaration, Jennings explained that she had taken some medication given to her by a friend and overslept.
>
> The prosecutor opposed the new trial motion. Regarding Pope, the prosecutor argued her testimony "would not add to the defense's case in such a manner that it would result in a different result on retrial" and that the defense did "not exhibit any showing of due diligence in discovering" her. Regarding Jennings, the

prosecutor argued that "[t]he defense took a risk by not serving it's [ sic ] witness with a subpoena and in doing so should not be allowed to later use this to declare the defendant did not receive a fair trial."

After hearing oral argument on the matter, the trial court denied the motion.  The court noted there was nothing "before the Court to indicate why [Pope] was not discovered" earlier and, in any event, the court did not "think there would have been a different result" had she testified.  The court also expressed its opinion that counsel's "reliance on [Jennings's] voluntary appearance was misplaced," but the court stood by its earlier ruling denying the continuance.

On appeal, defendant contends that although his trial attorney did not assert ineffective assistance of counsel as a basis for the new trial motion, the motion nonetheless establishes that defendant was denied effective assistance of counsel because the motion establishes that his trial attorney failed to subpoena Jennings and failed to discover Pope.  Accordingly, he contends, the judgment should be reversed on the basis of ineffective assistance of counsel.  We disagree.

"Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes both of the following: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]  If the defendant makes an insufficient showing of either one of these components, the ineffective assistance claim fails."  (People v. Rodrigues (1994) 8 Cal.4th 1060, 1126.)

"'Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'"  (People v. Zapien (1993) 4 Cal.4th 929, 980, quoting People v. Fosselman (1983) 33 Cal.3d 572, 581.)

In arguing the new trial motion, defense counsel admitted "[i]t was a defense strategy not to subpoena [Jennings] so that the prosecutor couldn't say, 'Aren't you only here under subpoena?'"  Acknowledging that trial counsel made a tactical decision, appellate counsel contends the decision was "absurd" and "irrational" and therefore amounted to ineffective assistance of counsel.  We disagree.  Based on Jennings's close, almost familial, relationship with defendant, it was reasonable for trial counsel to believe she would voluntarily appear to testify at trial in his defense.  It was also reasonable for counsel to believe that allowing Jennings to testify at trial without a subpoena would help bolster her credibility.  Although in hindsight trial counsel's tactical decision failed, not every tactical failure amounts to ineffective assistance of counsel.  Because trial counsel had a rational tactical purpose for not issuing a subpoena to Jennings, defendant's ineffective assistance of counsel claim will not stand on that basis.

That leaves trial counsel's failure to discover Pope and produce her as a witness during trial.  As previously noted, in denying the new trial motion, the court commented that there was nothing "before the Court to indicate why [Pope] was not discovered" earlier, before the trial ended.  Defendant contends this comment "was the functional equivalent of a finding that the defense counsel failed to

20

conduct an adequate investigation." We disagree. Although the trial court did state its belief that if the defense "investigator [had] made some efforts to find [Pope], I believe [defense counsel] would have found" her, there was no record before the court on which it actually could have determined whether trial counsel's failure to locate Pope fell below an objective standard of reasonableness.

In support of the new trial motion, trial counsel did not offer his own declaration or that of his investigator as to what efforts they made (or did not make) in attempting to locate witnesses. At the hearing on the motion, however, counsel stated that "[t]he defense went through great pains to try to determine who was where, and the neighborhood and the people involved simply just shut everybody down." On this bare record, the trial court could not have concluded that trial counsel's investigative efforts amounted to ineffective assistance of counsel, nor can we reach such a conclusion ourselves.

"In general, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus, not appeal.... [A]n ineffective assistance claim may be reviewed on direct appeal [only] where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (In re Dennis H. (2001) 88 Cal.App.4th 94, 98, fn. 1, 105 Cal.Rptr.2d 705, quoting People v. Pope (1979) 23 Cal.3d 412, 426.) On the limited record before us, we cannot say there was no satisfactory explanation for trial counsel's failure to locate Pope as a witness before or during the trial. Accordingly, defendant's ineffective assistance of counsel claim based on that failure must be left for habeas review.

(Respondent's Exhibit A, pp. 22-27.)

*Jennings*

The undersigned first considers the claim that counsel was ineffective for failing to subpoena Jennings. As noted by the California Court of Appeal, Grace Jennings testified at the preliminary hearing, where she was identified as Grace Henderson. (CT at 118.) At the preliminary hearing, she testified that she considered petitioner to be her brother as she was raised by his parents. (CT at 120.) Jennings testified that on September 2, 2002, she went to a park with Henderson. (CT at 120-21.) Jennings and Henderson began arguing. (CT at 123.) The argument turned physical. (Id.) Afer the fight, Jennings called petitioner on her cell phone to tell him about the fight. (CT at 125-26.) After she got off the phone, Henderson said she was going to call the police and blame her injuries on petitioner. (CT at 126.)

In her declaration submitted in support of the new trial motion, Jennings stated that on June 19, 2003, petitioner's trial attorney told her that she would probably testify on June 23,

2003.  (CT at 295.)  She told trial counsel that she would be available the entire day.  (Id.)
Jennings stated that trial counsel asked if she felt she would need a subpoena to insure her
presence.  (Id.)  Jennings stated that she promised him that she would be available without a
subpoena.  (Id.)  She also stated that she and trial counsel discussed the possibility of the
prosecutor asking her if she had been subpoenaed.  (Id.)  Trial counsel and Jennings decided that it
would be more potentially beneficial to the defense if she appeared without having been
subpoenaed.  (Id.)

On June 23, 2003, she contacted trial counsel and told him that she was quite ill
over the weekend and that her voice was inaudible.  (Id.)  Trial counsel told her that he would try
to arrange for a continuance.  (Id.)  Trial counsel later called and told her that her testimony would
take place on June 24, 2003.  (CT at 296.)  Later that day, Jennings took some medication that a
friend gave her.  (Id.)  When Jennings woke up on June 24, 2003, she realized that she was late for
court.  (Id.)  She called trial counsel and left messages with his voice mail.  (Id.)

While trial counsel's strategy of not subpoenaing Jennings ultimately backfired, the
finding by the California Court of Appeal that this tactical decision was not unreasonable was not
an unreasonable application of clearly established Supreme Court authority.  In addition, the
undersigned finds that it is not likely that the outcome of the trial would have been different had
Jennings testified.  As discussed above, the evidence that petitioner assaulted Henderson was not
weak. The fact that Jennings considered herself to be petitioner's sister undermined her credibility
in light of the circumstances of the case.  It is very unlikely that the jury would have believed
Henderson's final version of events, i.e. that Jennings beat her, had Jennings testified.  For these
reasons, this claim of ineffective assistance of counsel is without merit.

*Pope*

Following petitioner's conviction, his trial counsel filed a motion for a new trial.
(CT at 283.)  Trial counsel argued, in part, that he had discovered a new witness, Joi Pope.  (CT at
287.)  In her declaration attached to the new trial motion, Pope stated that she was in one of the

two cars that arrived at the house where Hamilton lived on May 11, 2002.  (CT at 291.)  She saw petitioner get out of the car and enter Hamilton's house.  (CT at 291-92.)  She saw Hamilton strike petitioner in the upper body immediately after Graves entered the doorway.  (CT at 292.)  She did not observe anyone leave the house until petitioner walked out after being in the house for one to three minutes.  (Id.)  She saw no person "talking with, arguing with, or being with any other person in the front of the residence the entire time Graves was in the residence."  (Id.)  She did not hear any screaming, yelling or other loud noises while she was in the car in front of the house after Graves entered it.  (Id.)  She did not see petitioner with a handgun or any other type of weapon when he entered or exited the house.  (Id.)

In her declaration, Pope said that she did not come forward before "this time" because she did not want to get involved with any problems between Hamilton and petitioner.  (Id.)  She feared for her own personal safety if she were to get involved.  (Id.)

At the hearing on the motion for a new trial, petitioner's trial told the court that "the defense went through great pains to try to determine who was where, and the neighborhood and the people involved simply shut everybody down."  (RT at 353.)

The trial court denied the motion for new trial regarding Pope for the following reasons:

> All right.  Let's deal first with the motion on the basis of the affidavit filed by Joy.  She indicate that she was outside the residence.  She didn't have an opportunity to determine what occurred inside the residence.  She was outside and did not observe the defendant's conduct.  Consequently, she could not have testified as to what occurred inside the house.  There was some testimony as to what occurred, but Joy could not have contradicted it since she didn't see it.
>
> It also appears to the Court that you have not made an adequate explanation as to why her discovery was not made prior to trial.  You do have a duty, the defendant does, to exercise due diligence in determining what evidence he or she will present.  There isn't anything before the Court to indicate why she was not discovered.  And you said the investigator had interviewed all the witnesses.  Had that investigator made some efforts to find Joy, I believe you would you would have found Joy.  In any event, even if Joy's testimony had been before the jury, I don't think there would have been a different result.

(RT at 355-56.)

23

On direct appeal, petitioner argued that his trial counsel was ineffective for failing to discover witness Pope sooner.  As set forth above, the California Court of Appeal found that petitioner should raise this claim in a habeas corpus petition because it could not determine from the record whether counsel acted reasonably in failing to discover Pope before trial.

The California Supreme Court denied petitioner's petition for review by the following order:

> Petition for review denied without prejudice to any relief to which defendant maybe entitled after this court determines in People v. Black, S126182 and People v. Towne, S125677, the effect of Blakely v. Washington (2004) _ U.S. _, 124 S.Ct. 2531, on California law.

(Respondent's Exhibit C.)

Petitioner then filed a habeas corpus petition in the Sacramento County Superior Court raising the ineffective assistance of counsel claim.  (Respondent's Exhibit D.)  This petition alleged that trial counsel was ineffective for failing to discover Pope.  (Id.)  Petitioner alleged that Pope signed a declaration stating that she did see him assault Hamilton.  (Id.)  However, petitioner did not attach a copy of Pope's declaration that had been submitted in support of the new trial motion.  Nor did petitioner submit a declaration by trial counsel explaining his attempts to locate Pope prior to trial.

The Superior Court denied this claim, in relevant part, as follows:

> According to petitioner, both of the above issues were raised on appeal.  The Third District Court of Appeal denied petitioner's claim on the merits with respect to Ms. Jennings and found the appellate record inadequate to resolve the claim with respect to Ms. Pope.  As petitioner's claim concerning Ms. Jennings has already been rejected on appeal, it is no longer cognizable on habeas.
>
> Petitioner's second claim, that he received ineffective assistance of counsel when his attorney failed to discover Ms. Pope, fails to state a prima facie case for relief.  Petitioner bears the burden of pleading facts which, if proven true, would entitle him to relief.  (People v. Duvall (1995) 9 Cal.4th 464.)  In order to meet this burden, he must state with particularity the facts upon which he is relying to justify relief.  (In re Swain (1949) 34 Cal.2d 300, 303-04.)  "Such factual allegations should also be supported by '[reasonably available] documentary evidence or affidavits.'"  (In re Harris (1993) 5 Cal.4th 813, 827 fn. 5.)

1    Petitioner's claim that Ms. Pope would have testified on his behalf is both vague
     and uncorroborated.  Therefore, he has failed to satisfy the above requirements.

2

3    (Respondent's Exhibit E.)

4         In order to succeed on this claim, petitioner must demonstrate that counsel acted

5    unreasonably in failing to discover Pope as a witness prior to trial.  As indicated above, the record

6    does not clearly indicate why counsel did not timely discover Pope.  However, for the reasons

7    discussed herein, petitioner is not entitled to an evidentiary hearing to explore this issue.

8         Federal courts may hold evidentiary hearings in habeas actions under certain

9    prescribed conditions:

10        If the applicant has failed to develop the factual basis of a claim in state court
          proceedings, the court shall not hold an evidentiary hearing on the claim unless the
11        applicant can show that-
          (A) the claim relies on-
12             (i) a new rule of constitutional law ...; or
               (ii) a factual predicate that could not have been previously
13                 discovered through the exercise of due diligence; and
          (B) the facts underlying the claim would be sufficient to establish by clear
14        and convincing evidence that but for constitutional error, no reasonable
          factfinder would have found the applicant guilty of the underlying offense.
15

16   28 U.S.C. § 2254(e)(2).

17         Whether a petitioner failed to develop a claim in state court turns on whether the

18   petitioner exhibited a lack of diligence or some greater fault in state court.  Williams v. Taylor,

19   529 U.S. 420 (2000).  Ordinary diligence requires that petitioner seek an evidentiary hearing in

20   state court in the manner prescribed by state law.  (Id. at 437.)

21         In the instant case, petitioner failed to diligently develop his ineffective assistance

22   of counsel claim in state court.  First, petitioner improperly raised the claim in his direct appeal.

23   When petitioner raised the claim in the state habeas petition filed in the Superior Court, it was not

24   adequately supported.  In particular, the Superior Court found that petitioner's claim that Pope

25   would have testified on his behalf was vague and unsupported.  Had petitioner included this

26   declaration, then the trial court may have developed the facts concerning why counsel failed to

discover Pope prior to trial.

Accordingly, petitioner is entitled to an evidentiary hearing only if the factual predicate of his claim could not have been previously discovered through the exercise of due diligence.  28 U.S.C. § 2254(e)(2).  In this case, the facts petitioner seeks to develop, i.e. whether counsel acted reasonably in failing to discover Pope prior to trial, could have been discovered in state court.  Petitioner could have obtained counsel's declaration explaining his actions regarding locating Pope.  Accordingly, petitioner is not entitled to an evidentiary hearing.

Because petitioner has not demonstrated that counsel acted unreasonably, the undersigned need not reach the prejudice prong of this claim.[5]  Accordingly, this claim should be denied.[6]

E. Claim Five

Petitioner argues that the trial court erred in denying his Batson/Wheeler motion. The California Court of Appeal denied this claim for the following reasons:

Denial Of Batson/Wheeler Motion

The prosecutor exercised peremptory challenges to excuse three prospective jurors who were African-American: Jurors Desha, Young, and Mitchell.  The pertinent portions of the voir dire of those jurors were as follows:

Juror Desha

The trial court asked the prospective jurors if "any of you or close members of your family or any one of your close friends had any problems along the lines of domestic violence."  Juror Desha responded that she had experienced domestic

---

[5]  However, the undersigned concurs with the trial court that it was highly unlikely that Ms. Pope's testimony would have affected the outcome of the trial.

[6]  The ineffective assistance of counsel claim regarding trial counsel's failure to discover Pope prior to trial is unexhausted.  By presenting the claim on direct appeal, petitioner presented this claim in a procedural posture in which it could not be reviewed on the merits.  Sweet v. Cupp, 640 F.2d 233 (9th Cir. 1981).  Petitioner then failed to present this claim to the California Supreme Court in a habeas corpus petition.  However, because respondent waived exhaustion, see Dkt. No. 6, p. 2, and because this claim is without merit, the undersigned may reach its merits.  28 U.S.C. § 2254(b)(2)(an application for writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust state court remedies);  28 U.S.C. § 2254(b)(3)(state may expressly waive the exhaustion requirement).

violence in 1991 and that the person responsible was never arrested. When asked how she felt about that, Juror Desha responded: "I think I was okay with him not being arrested."

Juror Desha also noted on her juror questionnaire that there was a personal matter she wanted to discuss with the court. In chambers, Juror Desha claimed she had inadvertently been involved in an attempted theft when she was younger because she "got involved with the wrong guy." When she was arrested for the crime, the police found drug paraphernalia in her purse, which she claimed her companion had placed there, and she was charged with possession. The charges were ultimately dismissed following diversion.

In chambers, the prosecutor questioned Juror Desha further about the domestic violence incident. Juror Desha said the perpetrator was her then-husband. When asked to explain her feelings about "him not being involved with the criminal justice system based on what happened to you," Juror Desha responded: "Well, I had some reservations when I did answer that. I kind of felt like I may have provoked him, what I was saying to him to cause him to hit me, but at the same time, I think maybe he should have been charged." When asked again to verify that her husband was never prosecuted, she said: "No, and maybe because he left town and went back to L.A. That is what happened. They came out to serve him and he was gone." She then reiterated, "I'm okay with it because I'm not with him anymore...."

Juror Young

In response to questions from the trial court, Juror Young admitted she had been on a jury in the late 80's or early 90's in a robbery case, and the jury had failed to reach a verdict. When the prosecutor asked her if there was "[a]nything about the fact that you did not come to a conclusion when you went to the deliberation room that affected you negatively," she said "[n]o" because she "felt that all the jurors on the case had their opinion and spoke their mind, and that's why it was a hung jury because people have different opinions."

Juror Mitchell

Juror Mitchell was a community college student who admitted he had been "arrested for excessive loud noise" because "me and my roomies were having a going away party."

Defendant's Motion

Following the dismissal of Jurors Desha, Young, and Mitchell, defense counsel "raise[d] an objection to the jury selection process pursuant to Wheeler" because "the prosecutor has released two who certainly appear to be African Americans," which counsel contended "may very well represent an attempt to deprive my client of a jury of his peers." The prosecutor agreed he had excused three prospective African-American jurors. The trial court noted "there [was] one African American remaining on the panel," but concluded defense counsel had "made a prima facie case" of a Wheeler violation and thus asked the prosecutor to "explain [his] excuses."

27

Regarding Juror Desha, the prosecutor explained that he "felt she would be an unfair juror" because of "her arrest for drug possession on what sounded like a robbery that she was involved in, as she claims unknowingly" and the "domestic violence incident that she did not believe required law enforcement intervention based on the fact that the perpetrator left town."  Regarding Juror Young, the prosecutor said he excused her "based on her opinions and conclusions concerning th[e] process [of being on a hung jury] and a lack of a real interest or care about the inability to come to some conclusions."  Regarding Juror Mitchell, the prosecutor explained he had excused him because of "his age and the nature of what appeared to be an arrest for excessive noise as opposed to being simply cited and released for that."

When asked for a response to the prosecutor's reasons, defense counsel noted that all three jurors had been passed for cause and based on that he thought "there might be a pattern here."

The trial court denied the <u>Batson/Wheeler</u> motion because the prosecutor had "made a plausible explanation for the basis for his excuses, his challenges," for which he "does have some support in the record."

Defendant contends the trial court erred in denying his <u>Batson/Wheeler</u> motion based on the prosecution's peremptory challenge of Jurors Desha, Young, and Mitchell.  We find no error.

Analysis

"Prospective jurors may not be excluded from jury service based solely on the presumption that they are biased because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. [Citations.]  A defendant bears the burden of establishing a prima facie case of <u>Wheeler</u> error. [Citation.]  If the court finds a prima facie case has been shown, the burden shifts to the prosecution to provide race-neutral reasons for the questioned peremptory challenges. [Citation.]  The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. [Citations.]  The explanations need not justify a challenge for cause. [Citation.]  'Jurors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.]'" (<u>People v. Gutierrez</u> (2002) 28 Cal.4th 1083, 1122.)  "Once a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its conclusion." (<u>Id</u>. at 1126.)

Defendant claims "[t]he trial court erred by finding the prosecutor's explanations for the peremptory challenges rebutted the prima facie case."  Defendant is mistaken.

With respect to Juror Desha, defendant admits her arrest "for narcotics possession may have been an adequate basis to exercise a peremptory challenge against her" (<u>see</u>, <u>e.g.</u>, <u>People v. Turner</u> (2001) 90 Cal.App.4th 413, 419 ["the arrest or conviction of a juror's relative provides a legitimate, group-neutral basis for excluding a juror"] ), but defendant complains about the prosecutor's reliance on her feelings regarding the fact that her then-husband was not prosecuted for

committing domestic violence against her.  Defendant suggests the prosecutor's second reason must have been pretextual because "Juror Desha would have been a desirable prosecution juror because she had been the victim of a similar crime."

One race-neutral reason for excusing Juror Desha was all the prosecutor needed. In any event, both of the prosecutor's reasons for excusing Juror Desha were valid and race-neutral.  It was reasonable for the prosecutor to believe that a juror who herself had been the victim of domestic violence, but was "okay with [the perpetrator] not being arrested," might not be a fair juror in a domestic violence case.

With respect to Juror Young, in his reply brief, defendant acknowledges that under People v. Rodriguez (1999) 76 Cal.App.4th 1093, 1114, "prior jury service on a hung jury provides a legitimate, group-neutral reason for a peremptory challenge."

Finally, with respect to Juror Mitchell, defendant suggests the prosecutor's reasoning was pretextual because "Juror Mitchell stated ... he did not have any hard feelings towards the police because of" his arrest, and "[i]t was not even clear that he was arrested."  On the latter point, it appears Juror Mitchell marked on his juror questionnaire that a friend or relative had been arrested for excessive noise, but on voir dire he admitted, "That was me."  The court asked, "Well, the police came out and talked to you, did they?" and Juror Mitchell responded, "Yeah."  On this record, the prosecutor could reasonably have concluded Juror Mitchell had been arrested, and (as we have noted with regard to Juror Desha) that arrest provided a legitimate, race-neutral basis for exercising a peremptory challenge.  Moreover, the prosecutor could have validly excused Juror Mitchell from the jury due to his lack of maturity.  (See People v. Sims (1993) 5 Cal.4th 405, 429-32.)

In one short paragraph of his opening brief, defendant purports to mount an attack on the prosecutor's peremptory challenges based on a "comparative analysis" of those challenges.  He implicitly acknowledges, however, that he made no such attack in the trial court, and that failure dooms his argument on appeal.  When "neither the trial court nor defense counsel engaged in any comparative juror analysis at trial, [the] defendant may not raise this claim on appeal."  (People v. Heard (2003) 31 Cal.4th 946, 971.)

In summary, we find no error in the trial court's denial of defendant's Batson/Wheeler motion.

(Respondent's Exhibit A, pp. 9-15.)

The Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race.  Batson v. Kentucky, 476 U.S. 79 (1986). In order to prevail on a Batson claim, a defendant must first establish a prima facie case of purposeful discrimination.  Batson, 476 U.S. at 96-97.  Where, as in this case, the trial court finds that a prima facie case has been established, "the burden shifts to the State to come forward with a

neutral explanation for challenging" the juror in question. Batson, 476 U.S. at 97.  The trial court must then decide whether the defendant has carried his burden of proving purposeful discrimination.  McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir. 2000); see also Batson, 476 U.S. at 98.  As with any creditibility determination, the court's own observations are of significant importance.  Batson, 476 U.S. at 98 n.21.

The issue at the final inquiry is the facial validity of the prosecutor's explanation. McClain, 217 F.3d at 1220; see also Batson, 476 U.S. at 98. The prosecution's challenges need not rise to the level justifying use of a challenge for cause. United States v. Power, 881 F.2d 733, 740 (9th Cir.1989) (citing Batson, 476 U.S. at 97-98).  Rather, a neutral explanation in this context means "an explanation based on something other than the race of the juror." McClain, 217 F.3d at 1220.

If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, the explanation may be deemed a pretext.  Id.  The fact that a prosecutor's reasons may be "founded on nothing more than a trial lawyer's instincts about a prospective juror" does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  Power, 881 F.2d at 740.

"The 'circumstantial and direct evidence' needed for this inquiry may include a comparative analysis of the jury voir dire and the jury questionnaires of all venire members, not just those venire members stricken." Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008). "'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar [footnote omitted] nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'" Id., quoting Miller-El v. Dretke, 545 U.S. 231, 241(2005).

The instant case concerns step three of the Batson analysis, i.e. whether the trial court properly found that the prosecutor offered race-neutral reasons for rejecting the three jurors and did not discriminate.  As set forth herein, the undersigned has reviewed the transcript from the

1  voir dire and finds that the trial court acted properly.

2          As discussed above, the prosecutor dismissed juror Desha because of her prior

3  arrest for drugs and her experience with domestic violence.  Regarding juror Desha, the

4  prosecutor stated,

5          And she is the woman we took into chambers to discuss one matter and ultimately
           discussed two matters with her, the first matter being her arrest for drug possession
6          on what sounded like a robbery that she was involved in, as she claims
           unknowingly.  The second issue we discussed with her was a domestic violence
7          incident that she did not believe required law enforcement intervention based on
           the fact that the perpetrator left town.

8
           It would be those two areas were the reasons or justification that I felt she would be
9          an unfair juror.  Especially given so her follow-up answers to defense counsels
           questioning concerning the initial arrest and she subsequently pled to and received
10         diversion for, that would be People's one.

11 (Respondent's Exhibit 5, p. 118.)

12         The prosecutor was referring to the following follow-up answers given by juror

13 Desha to defense counsel:

14         Defense Counsel:  Just a quick one.  When you were pulled over by the police and
           they found this paraphernalia, or even when you learned about the theft, did you
15         tell them like you didn't have anything to do with it?

16         Desha: I sure did.

17         Defense Counsel:  And did it like really irritate you that they wouldn't believe you?

18         Desha:  It really did.

19 (Respondent's Exhibit 5, p. 40.)

20         In essence, juror Desha was expressing an opinion that she had not been treated

21 fairly by the criminal justice system in that she had been wrongly arrested and later placed in a

22 diversion program.  Dismissal of a juror who believes they were wrongfully accused of a crime is

23 an acceptable race-neutral reason.  See United States v. Ortiz, 315 F.3d 873, 896 (8th Cir. 2002);

24 U.S. v. Ferguson, 23 F.3d 135, 141 (6th Cir. 1994).

25         The prosecutor also dismissed juror Desha based on her experience as a victim of

26 domestic violence and her view that it was "okay" that the perpetrator, her ex-husband, was not

arrested.  During voir dire, juror Desha stated that she may have caused the domestic violence:

> Prosecutor:  You told us in court that you didn't really have a problem with him not being involved with the criminal justice system based on what happened to you, could you explain your feelings regarding that a little more?

> Desha:  Well, I had some reservations when I did answer that.  I kind of felt like I may have provoked him, what I was saying to him to cause him to hit me, but at the same time, I think maybe he should have been charged.

(Respondent's Exhibit 5, pp. 41-42.)

> She also later stated that her husband was not prosecuted because he left town:

> Defense Counsel:  Did somebody come back along and say to you hey, do you really want to press charges?

> Desha:  I don't remember.

> Defense Counsel:  You did a police report, right, but they never prosecuted the guy?

> Desha:  No.

> Defense Counsel:  Your ex-husband.  Did you like intervene and say everything is okay?

> Desha:  I must have because I did come and fill out paperwork and everything.

> Defense Counsel:  And yet they never prosecuted him, your ex-husband?

> Desha:  No, and maybe because he left town and went back to L.A.  That is what happened.  They came out to serve him and he was gone.

> Defense Counsel:  And that's still okay with you?

> Desha:  I'm okay with it because I'm not with him anymore, so...

(Respondent's Exhibit 5, pp. 42-43.)

The views expressed by Desha above, i.e. that she may have provoked her ex-husband and that it was "okay" that he was not prosecuted, were not consistent with the prosecution's view toward domestic violence.  The prosecutor's decision to dismiss Desha based on these views was valid and race neutral.

Turning to juror Young, the prosecutor dismissed her because she had previously

served on a hung jury. This constituted a valid, race-neutral reason for dismissing juror Young. See United States v. Ruiz, 894 F.2d 501, 506-07 (2d Cir.1990); United States v. Mixon, 977 F.2d 921, 923 (5th Cir. 1992).

Finally, the prosecutor dismissed juror Mitchell based on his youth and his arrest for excessive noise. (Respondent's Exhibit 5, p. 116.) Juror Mitchell's youth, and the immaturity suggested by his arrest for loud noise, were valid race-neutral reasons to excuse him. See United States v. You, 382 F.3d 958, 968 (9th Cir. 2004) ("valid and non-discriminatory" reasons for strikes included that one excused "juror lacked the sufficient age and maturity level..."). In addition, juror Mitchell's responses to voir dire suggested that he believed he was not treated fairly by law enforcement:

> Court: You indicate here that a friend or relative was arrested for excessive loud noise.
>
> Mitchell: That was me.
>
> Court: Was that in your car?
>
> Mitchell: No, me and my roomies were having a going away party.
>
> Court: You made too much noise?
>
> Mitchell: So they say.

(Respondent's Exhibit 5, pp. 90-91.)

While juror Mitchell later stated that nothing about the experience made him hold a grudge against the police or would affect his ability to be a juror, it was not unreasonable for the prosecutor to dismiss him based on his responses to the questions set forth above. His response, "so they say," suggests that he questioned his arrest.

At the time he made the Batson/Wheeler motion, petitioner's trial counsel did not argue that the prosecutor's treatment of other jurors suggested an improper pretextual motive. (Respondent's Exhibit 5, p. 117-119.) However, in his opening brief filed on direct appeal, petitioner argued that a comparative analysis suggested that the prosecutor used his peremptory

challenges for improper reasons.  (Respondent's Lodged Document 6, opening brief, p. 51.)
Petitioner observed that the prosecutor did not dismiss juror twelve, whose mother had been the
victim of domestic violence.  (Id.)  Petitioner also observed that the prosecutor did not dismiss
juror five who had been prosecuted for driving under the influence and found guilty of reckless
driving.  (Id.)

Juror twelve stated that her father was violent toward her mother.  (Respondent's
Lodged Document 5, p. 13.)  The court asked juror twelve if they could judge the case fairly.  (Id.)
In response, juror twelve responded, "I hope so.  It was pretty emotional."  (Id.)  The undersigned
observes that juror three also told the court that there had been domestic violence in their home:
"Prior to my parents' divorce when I was very young, there had been a few incidents between my
parents."  (Id., p. 14.)

Jurors twelve and three were not themselves the victims of domestic violence.
More importantly, jurors twelve and three did not express ambivalence toward the issue of
domestic violence as had juror Desha.  The prosecutor's failure to strike jurors twelve and three
was not evidence of an improper pretext by the prosecutor.  In addition, the prosecutor had
another valid reason for striking juror Desha, i.e. her comments suggesting that she was
wrongfully prosecuted.

Juror five told the court that he had been convicted of reckless driving although
arrested for driving under the influence:

> Court:  You also have a friend who was either arrested or charged with driving
> under the influence.
>
> Juror Five:  That would be myself.
>
> Court:  How long ago was that?
>
> Juror Five:  Ten years.
>
> Court:  And do you think you were treated fairly by the system?
>
> Juror Five:  Yeah, I wasn't convicted for DUI.  It was reckless driving.

Court:  Do you hold any grudges against the police or district attorney or anyone as a result of that?

Juror Five:  No, Sir.

(Id., p. 108.)

While juror five had been convicted of a crime, he expressed no feeling that his involvement in the criminal justice system was at all unjust, unlike jurors Desha and Mitchell.  In addition, the prosecutor had additional valid reasons for dismissing juror Desha, i.e. her previous domestic violence experience, and juror Mitchell, his youth.

For the reasons stated above, the undersigned does not find that the prosecutor's reasons for dismissing jurors Desha, Mitchell and Young were pretextual.  The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

////
////
////
////
////
////

1   parties are advised that failure to file objections within the specified time may waive the right to

2   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED:  June 15, 2010

4

5

6   _____
    KENDALL J. NEWMAN
7   UNITED STATES MAGISTRATE JUDGE

8   graves.157

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26